IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| Geralyn A. Goodsite, | Case No. 3:11 CV 1166 |
| Plaintiff, | MEMORANDUM OPINION AND ORDER |
| -vs- | JUDGE JACK ZOUHARY |
| Norfolk Southern Railway Company, et al., | |
| Defendants. | |

## INTRODUCTION

Plaintiff Geralyn Goodsite brings claims of retaliatory discharge against Defendants Norfolk Southern Railway Company ("Norfolk Southern") and James Roskovics ("Roskovics") (collectively, "Defendants") under Title VII of the Civil Rights Act of 1964 and Ohio Revised Code § 4112 (Docs. 1 & 15). Retaliation claims brought under Ohio law are generally subject to the same analysis as Title VII claims. *Little Forest Med. Ctr. of Akron v. Ohio Civil Rights Comm'n*, 61 Ohio St. 3d 607, 609–10 (1991); *see also Hollins v. Atl. Co.*, 188 F.3d 652, 658 (6th Cir. 1999) (discrimination claims); *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001) (retaliation claims). Pending before this Court is briefing on Defendants' Motion for Summary Judgment (Docs. 67, 72–73), which was followed by oral argument (Docs. 79–80). For the reasons that follow, the Motion is granted.

## BACKGROUND

**Plaintiff's Work as a Carman for the Railroad**

Plaintiff began working for Norfolk Southern in its Bellevue, Ohio facility in October 2002 as a general laborer. In October 2004, Plaintiff began a three-year training program for a carman

position in the Mechanical Department, which she successfully completed. She then joined the Brotherhood Railway Carmen Union ("BRC") in February 2008. As a member of the BRC, Plaintiff was bound by a collective bargaining agreement ("CBA") (Doc. 38-2 at 23 & 163).

In general, the job of a carman is to fix railroad cars, working inside a repair shop or outside in the yard. To obtain a position in either the shop or the yard, an individual must "bid" on an open position. Carmen are assigned to yard work in six-person teams, with each member of the team working one of three possible positions: (1) the "A yard" position, responsible for examining trains upon their arrival to the yard; (2) the "single" position, primarily responsible for inspecting the air pressure in the train's brake system; and (3) the "tie-in" position, responsible for connecting the train's air hoses in preparation for departure. Four carmen are assigned to work the "tie-in" position, working in two two-person teams (Doc. 38-2 at 41–42).

During her training, and for several months thereafter, Plaintiff worked inside the shop; she then successfully bid for a second-shift position in the yard in March 2009 (*id.* at 45).

**Events of June 10 When Plaintiff Walked Off the Job**

On June 10, 2010, Plaintiff reported for work at 3:00 pm, as scheduled. The day prior, the murdered body of a woman had been discovered in a pond some distance north of the Bellevue yard (Doc. 38-1 at 32). The newspaper ran an article on June 10 about the body (*id.* at 87).

The shift started with a regular safety meeting led by shift supervisor Chris Davis. Employees, including Plaintiff, received their job assignments for the day at the conclusion of this meeting. Job assignments in the yard were determined according to seniority (Doc. 38-3 at 23–24). Each employee was allowed to choose his or her preferred position, with the most senior employee choosing first and the remaining employees choosing thereafter in order of seniority. When an employee chose the tie-in

2

position, he or she was also allowed to choose a partner. The partner could be any remaining member of the yard crew, regardless of seniority (Doc. 38-6 at 3).

On this date, Robby Heath, Jr. ("Heath") was the most senior employee on the yard crew. He chose to work the A-yard position. Russ James ("James") was next and chose to work the tie-in position with Nathaniel Holcomb ("Holcomb"). Anthony Renner chose next, also opting for the tie-in position and chose Jim Davis as his partner. This left Plaintiff to work the single position (Doc. 38-1 at 41).

Plaintiff disagreed with the job assignments, claiming that both Holcomb and Jim Davis were junior to her own status and, as such, should have to work the single position (*id.* at 47). According to shift supervisor Chris Davis, Plaintiff openly declared her refusal to work the single position but never mentioned safety concerns as the reason for her refusal:

> I informed Ms. Goodsite that, that she would be running, running single, instructed her to be running single that night, and, and her answer to me was no, I'm not. I'm going to be tying hoses. I'm older than another employee, Jim Davis, is what I was told. At that point in time, I . . . told Ms. Goodsite, you know, we were doing it by seniority, and she had told me that, that we weren't doing it the correct way by seniority, and I said well, this is the way that we're going to do it, and again I instructed her to p– that she'd be running single and with the same response no, I'll be tying hoses (Doc. 38-1 at 34–35).

Plaintiff then reported to Roskovics' office, both for a previously scheduled conference call with Norfolk Southern's equal employment opportunity ("EEO") officer Susan Decker ("Decker") and to discuss her job assignment for the day (Doc. 38-4 at 8). Roskovics was the senior general foreman of Bellevue's Mechanical Department (Doc. 38-4 at 3). During the conference call, the three discussed Plaintiff's previous complaints of graffiti in the restroom, the possibility of security cameras, and general scheduling concerns. According to Decker, Plaintiff did not mention any concerns with working the single position that day while the three were on the conference call (Doc. 45 at 8–11).

3

Following the conference call, Plaintiff and Roskovics continued to discuss Plaintiff's work assignment for the day (Doc. 38-3 at 24). Plaintiff alleges she told Roskovics she felt unsafe and requiring her to work the single position was discriminatory (*id.* at 35). Roskovics attempted to assuage Plaintiff's concerns (Doc. 38-5 at 3). At this point, their stories diverge.

According to Plaintiff, this exchange followed: Plaintiff asked if she "should wait to see if anything was going to change meaning [her] job assignment." Roskovics replied the job assignment was not going to change. Plaintiff then asked if she could be excused, to which Roskovics responded "yes." Plaintiff says she understood this affirmative answer to mean she was excused from work for the night. Plaintiff did not tell Roskovics or any other supervisor that she intended to leave work; she left the yard and headed home (Doc. 38-3 at 26–27)

According to Roskovics, Plaintiff proclaimed she felt unsafe and did not want to work the single position, but he advised her there was nothing unsafe about the assignment and he expected her to "go out and do her job." Again, Plaintiff never mentioned the murdered woman as the basis for her safety concerns. Plaintiff then walked out of his office, never asked to be excused and said nothing as she left. Roskovics specifically denies Plaintiff ever asked to be excused. It was his belief and expectation Plaintiff left his office to begin working the single position as assigned (Doc. 38-5 at 3, 6 & 55).

Chris Davis had been waiting outside Roskovics' office to discuss Plaintiff's insubordination during the safety meeting. After Plaintiff left Roskovics' office, Chris Davis raised the issue with Roskovics, at which time Roskovics told Chris Davis to bring Plaintiff back to discuss the matter, but Chris Davis was unable to find Plaintiff (Doc. 38-1 at 35). It is undisputed that after Plaintiff left Roskovics' office, she immediately left work (Doc. 38-3 at 27).

4

Upon learning Plaintiff had left, Roskovics contacted his supervisor and then the Norfolk Southern Labor Relations Board ("LRB") for advice on how to proceed. The LRB instructed him to remove Plaintiff from service (Doc. 38-5 at 6–7).

The next day, June 11, Plaintiff arrived for work as scheduled. Before she could check in, Roskovics, along with two other supervisors, informed Plaintiff she was removed from service pending a formal investigation. Plaintiff left the property (*id.* at 9 & 11).

**Rule 29 Disciplinary Hearing**

Norfolk Southern charged Plaintiff with (1) being insubordinate by failing to follow the instruction given to her by supervisor Chris Davis to work the single position, and (2) leaving her assigned position without permission on June 10. Norfolk Southern undertook an investigation into these charges as required by the CBA between Norfolk Southern and the BRC. Before discipline could be imposed, Rule 29 of the CBA required a hearing before an impartial hearing officer where both the railroad and the charged employee could present evidence and question or cross-examine witnesses (Doc. 38-1 at ¶ 4).

Plaintiff's formal hearing took place in July 2010 before Gregg Swany ("Swany"), a Norfolk Southern Division Manager of Mechanical Operations from Birmingham, Alabama. Also present at the hearing was Plaintiff, and two BRC representatives on behalf of Plaintiff. Swany took testimony from several Bellevue yard employees, including Plaintiff, Roskovics, Chris Davis, and fellow carmen Ryan Clapp ("Clapp"), Steve Notch ("Notch"), James, and Heath, all of whom were present at the June 10 safety meeting (Doc. 38-1 at 11). Clapp, Notch, James, and Heath confirmed that Plaintiff had openly refused to work the single position during the safety meeting (*id.* at 18–20).

Prior to the Rule 29 hearing, Swany was not briefed concerning the charges against Plaintiff, he did not speak to Roskovics, nor was he provided any witness statements or other materials (Doc.

5

38-1 at ¶ 6). Swany issued a formal written opinion in August 2010, finding that "[a] thorough review of the testimony contained in the transcript and the evidence presented during the Investigation clearly reflects that you are guilty as charged." He therefore terminated her railroad employment (Doc. 38-1 at 90). Plaintiff appealed Swany's decision to the Director of Labor Relations, and then appealed to the Public Law Board, each affirming the decision to terminate. The Board found Plaintiff left the premises without permission and further rejected her argument that safety concerns compelled her insubordination:

> First, there was nothing inherently unsafe in the Claimant working alone; other carmen, including the Claimant, are often assigned to work in the yard on single assignments. Secondly, the body that was discovered was not found at the work location but rather about a quarter mile off [Norfolk Southern's] property. Lastly, and particularly relevant, is the fact that when the supervisor instructed the Claimant to work the single assignment, the Claimant never indicated that she was in fear due to the discovery of the woman's body but protested on the basis of her position that her seniority rights were being violated (Doc. 38-3 at 149).

**Plaintiff's Complaints with the EEOC**

Two years earlier, in May 2008, Plaintiff filed a formal complaint with the Equal Employment Opportunity Commission. Her charges included: (1) denial of promotion to both electrician and machinist positions; (2) failure to receive credit for time spent training; and (3) removal from the safety committee (Doc. 38-2 at 183). The EEOC issued Plaintiff a right to sue letter in June 2009 (Doc. 38-2 at 185).

In December 2009, Plaintiff complained to Roskovics that another employee may have "sabotaged" trains that she and a partner had been working on as a tying crew. Plaintiff alleged that someone had closed the anglecocks affecting the air pressure on the braking system and causing train delays (Doc. 38-2 at 50–52). Plaintiff documented these allegations, and Roskovics assured Plaintiff he would investigate the claim (*id.* at 53 & 187–91). At the end of the month, Roskovics reported that

6

he could not find evidence of sabotage (Doc. 38-3 at 6; Doc. 38-4 at 20). Plaintiff contends Roskovics lied to her regarding the outcome of his investigation (*see* Doc. 72 at 9–10).

In January 2010, Plaintiff complained to Roskovics about some derogatory sexual graffiti written on a bathroom wall at the Bellevue yard (Doc. 38-3 at 6–7). Plaintiff returned to Roskovics a week or two later and informed him of additional graffiti (*id.* at 9–10). Roskovics told her he would have it painted over; he claims he did, she claims not so (Doc. 38-3 at 85). It is undisputed that he did tell employees that graffiti would not be tolerated and instructed supervisors to periodically check the bathroom for graffiti (Doc. 38-4 at 31–32; Doc. 38-6 at 7). Roskovics suggested to Plaintiff that she use a different bathroom, even though the next closest bathroom was "far" away (Doc. 38-4 at 22–23). Plaintiff further claims Roskovics told her that she should be proud to be referenced on a bathroom wall; Roskovics denies making this statement (Doc. 38-3 at 9–10; Doc. 38-4 at 23).

In May 2010, Plaintiff filed a second complaint with the EEOC alleging: (1) her removal from the safety committee; (2) improper treatment from the union chairman; (3) the alleged December 2009 train sabotage incident; (4) disparate treatment with regard to work assignments; and (5) retaliation for having filed her May 2008 complaint (Doc. 46-2 at 1–3). The EEOC was unable to conclude there had been a violation and issued Plaintiff a right to sue letter in February 2011 (Doc. 38-3 at 157).

On June 7, 2010, Plaintiff e-mailed Norfolk Southern's EEO office and management about newly discovered graffiti (Doc. 46-8 at 1–2), as well as to the EEOC. Three days later, on June 10, the same day as the incidents which led to her termination, EEO officer Decker had a conference call with Roskovics and Plaintiff to discuss her email, as outlined above.

In August 2010 (before receiving a termination notice from Swany), Plaintiff filed a third complaint with the EEOC. Her charges included: (1) the presence of "sexual and threatening" graffiti; (2) discrimination; (3) discriminatory discipline; (4) suspension from service without pay; (5)

7

bumping rights; (6) job bidding issues; (7) seniority rights; and (8) the denial of her right to a fair and impartial hearing (Doc. 38-3 at 160). The EEOC issued Plaintiff a right to sue letter in February 2011 (*id.* at 162), again with no finding of probable cause.

## STANDARD OF REVIEW

Pursuant to Federal Civil Rule 56(a), summary judgment is appropriate where there is "no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." This burden "may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When considering a motion for summary judgment, the district court must draw all inferences from the record in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The court is not permitted to weigh the evidence or determine the truth of any matter in dispute; rather, the court determines only whether the case contains sufficient evidence from which a jury could reasonably find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986).

## DISCUSSION

Plaintiff alleges Defendants retaliated against her for filing EEOC charges and reporting sexual harassment in violation of Title VII and R.C. § 4112.02(I) (Doc. 15). Title VII forbids employer retaliation against employees for making a charge, testifying, assisting, or participating in a Title VII investigation, proceeding, or hearing. *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 59 (2006). To establish a prima facie case of retaliation based on indirect evidence, Plaintiff must show: (1) she engaged in protected activity; (2) Defendants knew of her protected activity; (3) Defendants subsequently took an adverse, retaliatory action against her; and (4) Plaintiff's protected activity was the "but-for cause" of her termination. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*,

8

___U.S.____, 133 S. Ct. 2517, 2533 (June 24, 2013); *Randolph v. Ohio Dept. of Youth Servs.*, 453 F.3d 724, 736 (6th Cir. 2006). The fourth element requires "proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Nassar*, 133 S. Ct. at 2533. If Plaintiff establishes a prima facie case, the burden of production shifts to Defendants to "articulate some legitimate, nondiscriminatory reason" for their actions. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Plaintiff must then demonstrate "the proffered reason was not the true reason for the employment decision," but rather a mere pretext. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981).

Here, Defendants do not contest the first and second elements of Plaintiff's prima facie case (Doc. 67). With respect to the third element, though, the parties disagree about what actions qualify as adverse employment actions for purposes of retaliation. Plaintiff "must show that a reasonable employee would have found the challenged action materially adverse," such that it "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (internal citation and quotation marks omitted). However, "[a]n employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work." *Id.*

Defendants contend the adverse actions are limited to Plaintiff's removal from service and subsequent termination (Doc. 67 at 16–20). Plaintiff contends the following were also adverse actions: (1) Rockovics' issuance of a report that he was unable to substantiate Plaintiff's allegations of sabotage; (2) Roskovics' response and investigation (or lack thereof) into derogatory bathroom graffiti directed at Plaintiff; (3) Rockovics' requirement that Plaintiff work with Huffman at times, even though she stated she felt unsafe doing so; and (4) Roskovics' instruction that Plaintiff work the single position as assigned on June 10, 2010 and on other occasions, despite her articulated safety

9

concerns with the position (Doc. 72 at 21). These incidents cited by Plaintiff, however, do not constitute materially adverse employment actions under the law. *See Burlington Northern*, 548 U.S. at 68 ("The anti-retaliation provision protects an individual . . . from retaliation that produces an injury or harm . . . we speak of *material* adversity because we believe it is important to separate significant from trivial harms.") (emphasis in original); *see also White v. Cuyahoga County Juvenile Ct.*, 554 F.3d 624, 640 (6th Cir. 2009).

Roskovics' report that he was unable to substantiate Plaintiff's sabotage claim is not an adverse employment action. It is a straight-forward report based on interviews that had no apparent impact on the conditions of Plaintiff's employment. He was unable to determine who closed the anglecocks and found no evidence the incident was even directed at Plaintiff or her co-worker. Plaintiff claims Roskovics withheld information about his investigation from his official report on the incident. However, Plaintiff never learned of this alleged omission until after she was terminated and after she filed additional complaints. Even if true, Plaintiff concedes the "false" report did not deter her (7/11/13 Tr. at 8).

Plaintiff's contention that Roskovics failed to remove or investigate derogatory graffiti is also not an adverse employment action. Plaintiff's allegations of graffiti in the workplace do not amount to legally actionable adverse employment actions under a Title VII retaliation analysis; if anything, such a complaint is properly brought as a hostile work environment claim. *See Bryant v. FMC Techs.*, 2010 WL 3701576, at * 10 (S.D. Tex. 2010). Further, Roskovics took action to address the graffiti, informing employees on every shift that such graffiti was unacceptable and instructing supervisors to check for graffiti (Doc. 38-4 at 31–32; Doc. 38-6 at 7).

Finally, the requirement that Plaintiff follow Norfolk Southern's work assignment policies, which occasionally required her to work with Huffman and also work the single position, something

she apparently preferred not to do, did not result in an actual harm or injury that affected Plaintiff in a materially adverse manner. Plaintiff makes much of the fact that Roskovics testified that it was within his discretion to modify daily work assignments, yet he refused to modify Plaintiff's assignment so that she did not have to work the "single" position on June 10 (Doc. 38-4 at 28). However, Plaintiff never filed a grievance or complaint about working with Huffman or others prior to June 10; she chose to use vacation or personal days to avoid working with Huffman and others or to avoid working the single position. Plaintiff wanted her way, but the railroad was merely enforcing existing policies, in a reasonable manner and pursuant to the CBA. Such conduct does not constitute an adverse employment action. *Cf. Tepperwien v. Energy Nuclear Operations, Inc.*, 606 F. Supp. 2d 427, 444 (S.D.N.Y. 2009) ("[S]imply enforcing a pre-existing disciplinary policy in a reasonable fashion is insufficient to constitute adverse employment action.").

These alleged adverse employment disputes would not have dissuaded a reasonable employee from bringing a Title VII complaint. *Burlington Northern*, 548 U.S. at 68. In fact, they did not dissuade Plaintiff from doing so. She continued to file complaints during and after what she felt was mistreatment. The primary issue before this Court is whether there is some evidence in the record that Plaintiff's removal from service and eventual termination would not have occurred in the absence of her engaging in protected activity and, if Plaintiff does put forward sufficient evidence, then whether Defendants' proffered reasons for her removal and termination are mere pretext.

**Causal Connection**

At the fourth prong of Plaintiff's prima facie case, she must offer "proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Nassar*, 133 S. Ct. at 2533. Plaintiff claims to meet this requirement given the temporal proximity between the June 10 meeting to discuss her EEOC complaints and her removal from service

11

the next day, coupled with Roskovics' testimony that he was "upset" and "offended" that Plaintiff told the EEO officer that he had not removed the original graffiti (Doc. 38-4 at 27). Plaintiff is required to show that Roskovics' wrongful actions were the but-for cause of her termination, and she attempts to do so under a "cat's-paw" theory. Defendants argue the causal chain was broken by the LRB's instruction to Roskovics to suspend Plaintiff and Swany's subsequent independent investigation into the events of June 10.

The Supreme Court explained that, under the "cat's-paw" or "rubber-stamp" theory of liability, "if the employer's investigation results in an adverse action for reasons unrelated to the supervisor's original biased action" then the employer will not be liable. *Staub v. Proctor Hosp.*, ___U.S.____,131 S. Ct. 1186, 1193 (2011). However, "the supervisor's biased report may remain a causal factor if the independent investigation takes it into account without determining that the adverse action was, apart from the supervisor's recommendation, entirely justified." *Id.* In sum, when an adverse decision is "made by a supervisor who lacks impermissible bias, but that supervisor was influenced by another individual who was motivated by such bias, . . . the employer may be held liable." *Arendale v. City of Memphis*, 519 F.3d 587, 604 n.13 (6th Cir. 2008).

Plaintiff cites the recent case of *Bishop v. Ohio Dep't of Rehab. & Corr.*, 2013 WL 3388481 (6th Cir. July 9, 2013) in support of her contention that Swany's decision to terminate her did not break the causal chain under a cat's-paw theory of liability. In *Bishop*, plaintiffs, prison corrections officers, brought Title VII retaliation claims following their termination. Plaintiffs claimed their supervising lieutenant held a discriminatory animus against them because of their gender. *Id.* at *9. The warden, who lacked a discriminatory animus, made the ultimate decision to terminate. *Id.* However, the warden's decision was based *entirely* on her review of the supervising lieutenant's performance evaluation of plaintiffs. *Id.* at *11 (finding that defendants and the district court failed

12

to "point to any evidence in the record establishing that the Warden conducted an investigation independent of any input from Lt. Richardson").

Unlike the warden in *Bishop*, Swany did not simply take Roskovics' word for what happened. Rather, Swany undertook a comprehensive independent investigation into the incident. Swany heard testimony from several employees, including Plaintiff and Roskovics (Doc. 38-1 at 11–58). He also heard arguments on Plaintiff's behalf from her union representatives. Further, Swany had no knowledge of Plaintiff's prior complaints regarding discrimination and workplace harassment prior to the hearing, precluding him from holding a retaliatory intent (Doc. 38-1 at ¶ 10). The effect of any alleged discriminatory intentions held by Roskovics in retaliation to Plaintiff's EEO-related complaints were broken by the independent investigation and findings of Swany. Although Roskovics may have set the ball in motion for Plaintiff's termination by placing the call to his supervisor and the LRB, Swany did not view the events of June 10 through Roskovics' eyes; rather, he heard evidence from all parties involved and made an impartial decision. She did herself in. Roskovics' alleged animus was not the but-for cause of Plaintiff's termination.

**Pretext**

Even assuming Plaintiff could establish a prima facie case of retaliation, her insubordination and unauthorized departure from the worksite are legitimate, non-retaliatory reasons for her termination. Plaintiff maintains these reasons are merely pretext, and her suspension and termination were actually in response to her EEOC charges and other complaints to Norfolk Southern management. A plaintiff can rebut defendant's proffered rationale as pretext by showing: "(1) that the proffered reasons had no basis *in fact*, (2) that the proffered reasons did not *actually* motivate discharge, or (3) that they were *insufficient* to motivate discharge." *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994) (emphasis in original).

13

On June 10, Plaintiff left the worksite seemingly because Roskovics would not change her job assignment. Plaintiff testified she asked Roskovics if she "should wait to see if anything was going to change," referring to her job assignment (Doc. 38-3 at 26). When Roskovics told her the assignment was not going to change, Plaintiff left. Plaintiff testified that she believed she requested and received permission to leave the premises (as opposed to his office). Plaintiff argues this is a disputed issue of material fact precluding summary judgment because there are two versions of what was said in Roskovics' office on June 10. Indeed, Plaintiff describes this conflict as "the money question" -- that this five-minute period when the two are alone in his office creates a factual issue "that a jury has to decide" (Tr. at 24). This Court disagrees and here is why.

Plaintiff claims she asked to be "excused" and Roskovics said "yes." Roskovics denied that Plaintiff asked if she could be excused. While this Court must draw "all reasonable inferences in favor of the non-moving party," *BF Goodrich v. U.S. Filter Corp.*, 245 F.3d 587, 592 (6th Cir. 2001), it is not required to draw unreasonable inferences. *Audi AG v. D'Amato*, 469 F.3d 534, 545 (6th Cir. 2006); *see also Kyrtsos v. Cash-Calhoun*, 2012 WL 995003, at *6 (E.D. Mich. 2012). In the context of the conversation that had just occurred between Roskovics and Plaintiff, it is not a reasonable inference that Roskovics was giving Plaintiff permission to leave work for the day. The undisputed evidence is that Roskovics had just told Plaintiff that he was not going to change her work assignment for the day (Doc. 38-4 at 108; Doc. 38-3 at 26); it stretches logic that Roskovics would then turn on a dime and decide that although he was not going to change her work assignment, he would send Plaintiff home. Why would he? And who would work the assignment now that the shift had started? In other words, Plaintiff's understanding of the conversation she testified she had with Roskovics is neither reasonable nor plausible. Plaintiff concedes this Court is not required to view the alleged

14

conversation in isolation, but should be viewed in the context of the events of that day and before (Tr. at 32).

Further, Defendants had an honest belief that their actions were appropriate given Plaintiff's conduct, and Plaintiff has not presented anything more than conjecture to defeat this belief. The Sixth Circuit, in *Smith v. Chrysler Corp.*, 155 F.3d 799, 806–08 (6th Cir. 1998), adopted the "honest belief" rule with regard to employment actions, holding that so long as the employer honestly believed in the proffered reason for termination, even if the reason later turned out to be factually incorrect, the employee cannot establish pretext. "If the employer honestly, albeit mistakenly, believes in the non-discriminatory reason it relied upon in making its employment decision, then the employer arguably lacks the necessary discriminatory intent . . . ." *Id.* at 806. Under the undisputed material facts, Plaintiff simply fails to establish a triable issue of pretext.

## CONCLUSION

This Court has made a careful examination of the record, reviewed extensive briefing and heard oral argument. Plaintiff's string of allegations and approach of "wait -- there is more," as reflected in her charges before the EEOC and in this case (such as her multi-page errata to her deposition (Doc. 38-2)), do not change the pivotal issue -- why was she fired -- and the clear answer -- because she abandoned her job. She left in a huff. Are there some discrepancies in the story as told by the parties? Sure, but they are either immaterial or unreasonable. The outcome of this federal court review is the same as the state administrative, company and union reviews.

For the foregoing reasons, Defendants' Motion for Summary Judgment (Doc. 67) is granted.

IT IS SO ORDERED.

                                              s/ *Jack Zouhary*
                                              JACK ZOUHARY
                                              U. S. DISTRICT JUDGE

July 31, 2013